IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **TIRONNE AKILLIA SIMPKINS,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:13-cv-1153** |
| | ) | |
| **JAMES HOLLOWAY, Warden,** | ) | **Judge Trauger** |
| | ) | |
| **Respondent.** | ) | |

<u>**MEMORANDUM OPINION**</u>

Petitioner Tironne Akillia Simpkins, a prisoner in state custody at the Charles Bass Correctional Complex, has filed a *pro se* petition under 28 U.S.C. § 2254 for a writ of habeas corpus (ECF No. 1). The respondent filed an answer in opposition to the petition, along with a complete copy of the relevant portions of the underlying state-court record. The court has also considered the petitioner's arguments in his motion for leave to amend the original habeas petition (ECF No. 9) filed after the response. The petition is ripe for review, and this court has jurisdiction. 28 U.S.C. § 2241(d). For the reasons set forth herein, the petition will be denied and this matter dismissed.

**I.      PROCEDURAL BACKGROUND**

In September 2011, the petitioner entered a plea of guilty in the Davidson County Criminal Court to one count of aggravated robbery and four counts of especially aggravated kidnapping. Pursuant to the plea agreement, the petitioner received an effective sentence of 15 years' incarceration, to be served at 100%. (ECF No. 6-1, at 4–9 (Indictment), 10–13 (Pet'n to Enter Guilty Plea and Order accepting plea), and 14–18 (Judgments).) The petitioner did not pursue a direct appeal of his convictions or sentence. Instead, he filed a *pro se* post-conviction petition in the state court in November 2011. (ECF No. 6-1, at 19–29.) After the appointment of post-conviction counsel, an amended petition was filed. (ECF No. 6-1, at 33–38.) The trial court conducted a hearing and then entered an order denying the petition. (ECF No. 6-1, at 40–44.) That decision was affirmed on appeal. *Simpkins v. State*, No. M2012–01558–CCA–R3–PC, 2013 WL 775957 (Tenn. Ct. Crim. App. Feb. 28, 2013), *perm. app. denied* (Tenn. June 12, 2013).[1]

Simpkins' undated § 2254 petition was received and docketed in this court on October 17, 2013.

---
[1] In the state proceedings, the petitioner's name is spelled as "Tirrone" instead of "Tironne."

The respondent concedes that the petition is timely.

## II.     FACTUAL BASIS FOR PLEA AGREEMENT

The Tennessee Court of Criminal Appeals recounted the state's recital of the factual basis for the

petitioner's guilty plea at the plea hearing follows:[2]

> [O]n May 18th, 2009 in the early morning hours there were five employees in the Shoney's Restaurant located at Highway 70 South and I-40 in Bellevue[.] Francisco Perez, Teresa Kline, Dora Dalcroze, Arcilia Ruiz, and the manager on duty, Mr. Karnae, were present and preparing the business to open.
>
> As the employees were getting the restaurant ready to open, just prior to 6 o'clock, Mr. Perez went to take the trash out the back door outside the kitchen. As he opened the door, two men rushed into the back. Both men were dressed in dark clothing, one had a mask on, both had guns.
>
> The person with the mask on, who the investigation later reve[a]led was the co-defendant in this case, Jerome Teats [("the co-defendant")], first took Mr. Perez, held a gun to his head, and forced him into a hallway or a dry storage area back in the kitchen. It was a one-opening hallway in the back that had shelves on both sides. Mr. Perez went back into that area. And while that was going on, [the Petitioner] had Ms. Ruiz, held a gun to her head, asked her how many employees were in the restaurant, and then forced her to go back into the dry-storage hallway area. As that took place, . . . [the Petitioner] also asked Ms. Ruiz where the manager was, she indicated towards the office area in the kitchen, which was a small—basically closet in the back that had a desk and a safe in it.
>
> [The co-defendant] then went to the area where the office was and Mr. Farina [sic[3]] was in there. He went inside with the gun and took Mr. Farina out of the office and forced him towards the front of the restaurant where the register was. Ms. Dora Dalcroze observed this happening as she was coming back into the kitchen from the front of the restaurant where she had been setting up the buffet line.
>
> As [the co-defendant] brought the manager up to the front area where the cash register was, [the Petitioner] was standing in the back blocking the exits to the hallway where the other individuals were. Ms. Dalcroze and Ms. Teresa Kline were the other two individuals that were not yet in the hallway. At that point in time, [the Petitioner] started speaking harshly to Ms. Dalcroze, who could not understand him. She spoke Spanish and wasn't understanding his English. He was yelling at her.
>
> She—as she was walking to the hallway area, he held the gun on her, and [s]he was trying to get out of the line of the gun and he kept the gun focused on her and tracking her as she moved. She eventually, when Ms. Teresa Kline came to the area, Ms. Kline brought them both to the area where [the Petitioner] was telling them to go.
>
> At that point in time, all four employees were at the far end of the hallway. [The Petitioner] stood at the door—the opening area so that the four individuals in the back could not get past him. As that was going on, [the codefendant] was in the front of the restaurant with the gun, he had pistol whipped him in the head and was demanding th[e] cash. He—the manager was able to open the cash register, and they, together, Mr.

---

[2] The transcript of the plea hearing is in the record before this court as an exhibit to the post-conviction hearing transcript. (ECF No. 6-3.)

[3] The court presumes that earlier reference to the manager on duty as "Mr. Karnae" to be an error on the part of the state prosecutor performing the recitation of facts.

Farina being at gunpoint at this point in time, filled a plastic bag with all of the cash that was in the cash register.

After that took place, [the co-defendant] took the manager back to the hallway area where the remaining victims were, forced him into the hallway. Both the men told them all to get down on the ground and put their faces on the floor. Throughout this they were yelling not to look at them and look away. After all of the employees were on the floor in the back of the drystorage area, both defendants left the Shoney's.

Across the street in a[n] office park called Harpeth Valley, a white blazer was parked. That blazer belong[ed] to [the co-defendant]. As the two men were running out of the restaurant, a customer who was there waiting for the restaurant to open observed them running and called 911. He actually followed one of the individuals, turns out to be [the co-defendant], as [the codefendant] was running through the neighborhood, from th[e] office park area into a residential neighborhood. As that citizen was on the phone with 911, he stayed on the phone until he saw police and spoke with police at that time.

Police responded to the neighborhood area and were pointed in a direction of a house. And at that point in time Officer Regan and Sergeant Teet went to the crawl space of the house, which had been locked by a citizen in the area. They unlocked the crawl space and pulled out the co-defendant. . . .

At that point in time, [the co-defendant] was taken into custody, Sergeant Teet went—officers were still pursuing this other individual, [the Petitioner], who had run across I-40 and was last spotted running in the direction of Bellevue mall. Officers were pursuing him and approximately an hour later Officer Seroche and Sergeant Teet caught up with [the Petitioner]. He had been discarding several items of clothing as he was running in the area and he had been seen running through the grass and then laying down in the grass trying to evade police. They did eventually catch up to him and take him into custody.

Both defendants were asked if they wanted to speak to police. [The Petitioner] told Detective Stokes, I didn't do anything, he did it all. Then told Detective Stokes, you can't charge me. [The co-defendant] spoke to police and admitted that he and [the Petitioner] drove to the area in the white blazer, waited for . . . somebody to come out of the restaurant and then went in the back and robbed it.

$737 in cash and coins was located in [the co-defendant's] vehicle, in a black plastic trash bag consistent with the trash bag on the floor of the Shoney's. Police recovered that, items of clothing that these defendants were described as wearing and [the co-defendant's] driver's license from the front seat of his vehicle.

After detectives gave the cash back to the manager, had a receipt signed for it, both defendants were charged with the robbery. On May 22, 2009, when Detective Stokes arrived for the preliminary hearing he learned that—initially it had been reported that both individuals wore masks, he learned at that point in time that that was not true. There had been a language barrier with a number of the victims at the restaurant. Upon hearing that one of them did not have a mask on, he asked the victims if they would participate in a photographic lineup. Ms. Dora Dalcroze went to west precinct and viewed the photographic lineup, she immediately picked out the photograph of [the Petitioner] as the person who was not wearing the mask in the back of the Shoney's on that day.

Ms. Dalcroze, Mr. Perez, and Ms. Ruiz [have] appeared in numerous hearings. And Ms. Dalcroze, every time she has been called to testify has consistently identified [the Petitioner] as the man who did not have a mask on who participated on that day of robbing the Shoney's and held the rest of the employees at gunpoint.

*Simpkins*, 2013 WL 775957, at *1–3 (most alterations in original).

In addition, the petitioner testified at the plea petition hearing and

denied being under the influence of drugs or alcohol or suffering from any mental health problems. He agreed that he had discussed the charges against him with his counsel ("trial counsel") and was satisfied with trial counsel's representation. He agreed that he understood that, by pleading guilty, he was waiving his rights to a jury trial represented by counsel; to call witnesses and cross-examine the State's witnesses; to testify or not testify at the trial; and to appeal the verdict and resulting sentence if the jury were to find him guilty. The Petitioner stated that he believed it to be in his best interest to plead guilty. He understood that he was pleading guilty to felonies which could be used to enhance his sentence in a future felony case. The Petitioner denied that anyone was forcing him to plead guilty or that anyone was promising him anything other than the stipulations of the plea agreement.

*Id.* at 3 (footnote omitted).

## III.    EVIDENCE PRESENTED AT POST-CONVICTION PROCEEDINGS

The Tennessee Court of Criminal Appeals summarized the evidence presented during the post-

conviction hearing as follows:

At the post-conviction hearing, the Petitioner testified that, originally, he planned to proceed to trial. On the day of trial, however, he pleaded guilty to all five of his indicted charges. He stated that he met with trial counsel at least six times prior to entering his plea. Trial counsel explained his charges to him, but the Petitioner did not understand why he was charged with kidnapping when he "didn't actually kidnap" anyone. He estimated that the entire incident for which he was charged lasted a period of approximately five minutes. Furthermore, he believed the evidence was insufficient to support a kidnapping "because of the intent. [His] intention was not to kidnap nobody [sic]." Post-conviction counsel asked the Petitioner, "Did [trial counsel] explain to you that a robbery and a kidnapping that happen so quickly . . . really couldn't be both?" The Petitioner responded, "No," and added that trial counsel did not explain any of the applicable case law. Furthermore, the Petitioner stated that, had trial counsel explained more regarding this issue, the Petitioner would not have pleaded guilty and instead would have proceeded to trial. He testified, "[M]y co-defendant was telling me that [trial counsel] was speaking to his lawyer telling him things about my case. . . . [Trial counsel] told him things that if she would've told me personally, I would've went [sic] to trial." The post-conviction court clarified this issue with the Petitioner, and the Petitioner explained, "[Trial counsel] told [the co-defendant's] lawyer that if I was to go to trial that I might not get charged for the robbery, but I might get charged for the kidnappings." Additionally, the Petitioner stated that he asked trial counsel to argue "under the Jencks" when she filed a motion to suppress the identification and other statements of the witness, Delacruz [spelled elsewhere in the record as "Dalcroze"]. He also claimed that all he had from the police were "supplementary reports."

The Petitioner testified that he entered a "best interest" plea in this case because

I felt that I was not being presented [sic]. I felt that my lawyers was [sic] not ready to go to trial. They—she was telling me that I was going to get a life sentence and she called my father and told him the same thing to try to talk me out of going to trial.

Furthermore, he stated, "I didn't know how to exactly give a best interest plea but

I verbally just said it." The Petitioner's final complaint about trial counsel was that he, on several occasions, asked trial counsel to look into whether some of the immigrant witnesses were "legal witnesses" but that "nothing else was done about that."

On cross-examination, the Petitioner acknowledged that, in addition to the six or more times that trial counsel met with him at the jail, trial counsel also met with him on the days of his numerous court appearances. Additionally, he acknowledged that trial counsel filed numerous pretrial motions and that the Petitioner was present at each of those hearings. When asked about his discussion with trial counsel regarding the kidnapping charges, the Petitioner stated that they discussed the charges but that "[i]t really wasn't a breakdown of the law." He further acknowledged discussing with trial counsel that he kept the victims "somewhere they didn't want to be" and that "there was a weapon involved." He also agreed that, during the incident, the victims could not reach an exit to the restaurant without passing the Petitioner. When discussing his desire to get the "statement" of Delacruz from the State, he agreed that one reason he might not have received that statement was because Delacruz, in fact, did not make a statement to police.

The Petitioner also recognized that, based on his prior felonies, he was eligible to serve twenty-five to forty years at 100% on each especially aggravated kidnapping conviction had he proceeded to trial. Therefore, he agreed that, if the trial court had chosen to run the sentences consecutively, he could have received a minimum sentence of one hundred years, not including the sentence for robbery. He also agreed that the State's offer of an effective sentence of fifteen years at 100% was substantially less than what he might have faced had he gone to trial.

The State asked the Petitioner to further explain some of his complaints against trial counsel. The Petitioner stated that he did not understand "the actual definition of especially aggravated kidnapping" and that trial counsel did not discuss this concept with him. He claimed that, had he understood the definition, he would not have pleaded guilty. With respect to the Petitioner's contention that his plea was unknowing and involuntary, he confirmed that he requested to enter a guilty plea on the day of trial. Furthermore, he agreed that, prior to his plea, he reviewed with trial counsel the charges for which he pleaded guilty as well as the sentences for each charge. He stated, "I knew that my lawyers wasn't [sic] fighting for me. I didn't know what else to do. And [trial counsel] told me that I can give a best interest plea."

The State entered a transcript of the guilty plea hearing into evidence and then called trial counsel to testify. Trial counsel testified that all of her practice since 2004 had been devoted to criminal defense work. Prior to the Petitioner's case, trial counsel had participated in four jury trials: a murder case; an order of protection case; a drug case; and a rape of a child case. She had a software database documenting all of her encounters with the Petitioner, and, according to her data, personnel from trial counsel's office met at the jail with the Petitioner approximately twenty-three times. Of those occasions, trial counsel estimated that she personally was present approximately twenty times. She also exchanged written correspondence with the Petitioner approximately five to ten times. Trial counsel acknowledged that another attorney ("assistant trial counsel") was assigned to assist her in the Petitioner's case at trial.

Trial counsel discussed the numerous pretrial motions that she filed on the Petitioner's behalf. The State asked trial counsel about her discussions with the Petitioner regarding "the motions on the especially aggravated kidnapping counts, and the double jeopardy issue, and dismissing those." Trial counsel responded,

> We . . . talked a lot about that issue. . . . That issue was in flux in the Tennessee Supreme Court, so through the life of [the Petitioner's] case the law was

changing. And then it was sort of up in the air so we had a lot of discussions because . . . this Jason Lee White case was pending for such a long time. . . .

We laid out for him where the law—which direction the law had been going, which was bad for the defense, and where it might end up. But, I mean, we spent, I would say, hours discussing that. And I was actually writing the amicus brief on the issue, so I was very familiar with it.

Trial counsel stated that she found a letter she sent to the Petitioner spelling out exactly what the State was required to prove as to his indicted counts. The State asked trial counsel whether the Petitioner eventually seemed to understand the especially aggravated kidnapping law. Trial counsel stated, "Yes. [The Petitioner] would often . . . say he didn't understand things, and we would break it down and go over these sort of subparts of it. And a lot of times it seemed sort of what he was saying was it didn't seem right, or fair, or reasonable."

Trial counsel agreed that she reviewed with the Petitioner his potential sentence if he proceeded to trial. She forwarded everything to the Petitioner that she received from the State. Regarding the immigration status of the victims, trial counsel could not remember what she filed on the issue. She did remember that it was an issue she would have to address in a jury-out proceeding at trial but that she never got to that point. She had learned from the co-defendant's trial that the victims were working legally in the United States.

Trial counsel testified that, leading up to and on the day of the trial, she explained to the Petitioner that he "didn't have a credible defense on the aggravated robbery count." Furthermore, trial counsel stated that the Petitioner eventually agreed. Therefore, the main issue at trial would be the especially aggravated kidnapping counts. Trial counsel testified further,

And when we did the math, what we estimated the Judge's sentence would be just on the ag[gravated] robbery, basically if we had won with our defense . . . we just . . . said maybe about 18 years would be a reasonable sentence from this Court in this situation.

And when we did the math realized that the offer probably would have been a matter of months of a difference of our best case scenario and what the offer was. So what we explained to him was going to trial to save you six months or so, but what we[ a]re risking is the rest of your life.

From that discussion, the Petitioner indicated his desire to plead guilty. She stated, "I think he—all I can say is I think [the Petitioner] understood what we were saying about it just not being worth it to go to trial, that we were fighting for too little and risking too much." Trial counsel confirmed that she reviewed the written plea petition with the Petitioner. She testified that she was ready for trial if the Petitioner had decided not to enter a plea.

Assistant trial counsel testified that she assisted trial counsel in the Petitioner's case. According to her documentation, she was present on five of the occasions that trial counsel met with the Petitioner. She also was present for all hearings that occurred once she began assisting trial counsel with the case. She stated that, during those discussions, "[w]e would try to explain to him . . . how the law and the facts could apply, especially during the course of a jury trial." Furthermore, she noted that the Petitioner

would frequently say I don't understand. . . . And then we would always say, explain to us what you don't understand so we can go back through it again. . . . And then he

would always end with, I think I understand, so we didn't have any reason to believe he didn't understand how the law, in fact, has to be applied to his particular case.

Assistant trial counsel clarified with the court that the Petitioner seemed not to understand how the facts of his case could equate to kidnapping. Regarding the Petitioner's decision to plead guilty, assistant trial counsel stated, "I had an indication that he was reluctant about . . . his decision, but I felt that he understood what he was doing."

*Id.* at *3–6.

## IV.  ISSUES PRESENTED FOR REVIEW

In his habeas petition in this court, Simpkins asserts the following claims for relief:

Ground One: That trial counsel was ineffective because she (a) did not investigate the case properly, (b) did not speak with witnesses about their statements; and (c) failed to subpoena a witness who would have been favorable to the defense.

Ground Two: That the petitioner's guilty plea was not knowing and voluntary.

Ground Three: That the prosecution failed to disclose favorable evidence to the defense.

Ground Four: That his "conviction was obtained by use of coerced confession." (ECF No. 1, at 5.)

In his recently filed motion for leave to amend his petition, Simpkins seeks to add a fifth ground for relief: that his kidnapping convictions violate federal due process as interpreted in *Fiore v. White*, 531 U.S. 225 (2001), because he was convicted for "conduct that the kidnapping criminal statute, properly interpreted, does not prohibit." (ECF No. 9, at 1.)

## V.  STANDARD OF REVIEW

### A.  Defaulted or Unexhausted Claims

A federal district court will not entertain a petition for writ of habeas corpus unless the petitioner has first exhausted all available state-court remedies for each claim in his petition. 28 U.S.C. § 2254(b)(1). While exhaustion is not a jurisdictional requirement, it is a strictly enforced doctrine which promotes comity between the states and the federal government by giving the state an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Consequently, as a condition precedent to seeking federal habeas corpus relief, the petitioner is required to fairly present his claims to every available level of the state court system. *Rose v. Lundy*, 455 U.S. 509, 518–20 (1982); *see also Duncan v. Henry*, 513 U.S. 364, 365–66 (1995) ("[A] federal habeas petitioner . . . [must] provide the state courts with a 'fair opportunity' to apply controlling

legal principles to the facts bearing upon his constitutional claim."). Moreover, "the doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court." *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998). Once his federal claims have been raised in the highest state court available,[4] the exhaustion requirement is satisfied, even if that court refused to consider the claims. *Manning v. Alexander*, 912 F.2d 878, 883 (6th Cir. 1990).

A habeas petitioner bears the burden of demonstrating that he has properly and fully exhausted his available state court remedies with respect to the claims he presents for federal habeas review. *Prather v. Rees*, 822 F.2d 1418, 1420 n.3 (6th Cir. 1987) (citation omitted). If a habeas petitioner retains the right under state law to raise a claim by any available procedure, he has not exhausted that claim. 28 U.S.C. § 2254(c). Ordinarily, habeas petitions containing unexhausted claims are dismissed without prejudice in order to permit the petitioner the opportunity to pursue them in state court. *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002) (citing *Rose*, 455 U.S. at 518, 520–22); *see also Rhines v. Weber*, 544 U.S. 269 (2005) (reconfirming the continued relevance of *Rose* under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")).

If, however, an unexhausted claim would be procedurally barred under state law, for instance by a statute of limitations or a state rule barring successive petitions, then the claim is deemed exhausted (because no further state review is available) but procedurally defaulted (because it was not presented to a state court for review), and may not be considered by the federal court on habeas review except under extraordinary circumstances. *Alley v. Bell*, 307 F.3d 380, 385–86 (6th Cir. 2002) (citations omitted); *In re Cook*, 215 F.3d 606, 607–08 (6th Cir. 2000). Specifically, in order to obtain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate both "cause" for the procedural default and actual prejudice resulting from the alleged constitutional errors, or alternatively that failure to consider the claims will result in a "fundamental miscarriage of justice." *Wogenstahl v. Mitchell*, 668 F.3d 307, 321 (6th Cir. 2012), *cert. denied*, --- U.S. ----, 133 S. Ct. 311 (2012) (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).

---

[4] In Tennessee, review by the state Supreme Court is not required for exhaustion. Instead, "once the Court of Criminal Appeals has denied a claim of error, 'the litigant shall be deemed to have exhausted all available state remedies available for that claim.'" *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. S. Ct. R. 39).

**B.      Standard of Review of Fully Exhausted Claims**

Even when a petitioner's application for a writ of habeas corpus raises only federal constitutional claims that have been properly exhausted in the state courts, this court's review of the state court's resolution of those issues remains quite limited. The standard for reviewing applications for the writ of habeas corpus is set forth in 28 U.S.C. § 2254(d). This section states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.* In other words, a federal court is bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law. *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000); *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Further, this court must presume the correctness of state court factual determinations, and the petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Cremeans v. Chapleau*, 62 F.3d 167, 169 (6th Cir. 1995) ("We give complete deference to state court findings unless they are clearly erroneous."), *abrogated on other grounds by Thompson v. Keohane*, 516 U.S. 99, 111 (1995).

The United States Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . . A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [this Court's] precedent.

*Williams v. Taylor*, 529 U.S. 362, 405–06 (2000) (citation omitted).

With respect to the "unreasonable application" clause of § 2254(d)(1), the Supreme Court has held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause when "a state-court decision unreasonably applies the law of this Court to the facts of

a prisoner's case." *Williams*, 529 U.S. at 409. The Court defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . . .
>
> . . . . [A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 409–11 (emphasis original).

With these principles in mind, the court will turn to the examination of the claims raised in Simpkins' petition for habeas relief.

## VI.    ANALYSIS AND DISCUSSION

### A.    Defaulted Claims

The respondent contends that Ground One (ineffective assistance of counsel), Ground Three (*Brady* violation, *Brady v. Maryland*, 373 U.S. 83 (1963)) and Ground Four (coerced confession) are procedurally defaulted and therefore barred from review. The court has reviewed the underlying record and agrees that these issues were not preserved for review by this court. The court also finds that Simpkins' new claim for relief, based on an alleged due-process violation, is likewise procedurally defaulted.

Simpkins did raise some of his defaulted claims in his initial state petition for post-conviction relief (ECF No. 6-1, at 23, 27–29), and he has argued at every stage in the post-conviction process that he did not believe he was guilty of kidnapping and that he did not understand how he could be guilty of kidnapping when he did not intend to kidnap anyone. At the post-conviction hearing, the trial court examined the petitioner concerning all the issues raised in both the *pro se* petition and the amended petition filed by counsel. (*See* ECF No. 6-2.) The only issues presented on appeal, however, were that the guilty plea was not knowing and voluntary and that trial counsel was ineffective because she "never reviewed *State v. Anthony*[, 817 S.W.2d 299 (Tenn. 1991),] *overruled in part by State v. White*, 362 S.W.3d 559 (Tenn. 2012),] and its progeny with [the petitioner] which h[e]ld that a kidnapping cannot be 'essentially incidental' to the underlying robbery." (ECF No. 6-4, at 6.) The petitioner claimed that, if he had "known about the *State v. Anthony* issue he would not have entered a plea[ ] but would have

proceeded to trial." (*Id.*) He also claimed his trial counsel was not ready for trial. (*Id.*)

The ineffective-assistance claims the petitioner raises now, however, are not related to the *State v. Anthony* issue. Instead, the petitioner claims that his attorney failed to investigate the case properly, did not speak with the witnesses about their statements, and failed to subpoena a favorable witness. It is clear from the record that these issues, like the claims of a *Brady* violation and coerced confession, were never presented to the Tennessee Court of Criminal Appeals.

The new due-process claim *is* somewhat related to the *State v. Anthony* issue: The petitioner asserts that *State v. White*, which overruled *Anthony* in part, constitutes an "intervening change in the law" that renders the petitioner "actually innocent" of the kidnapping charges. In fact, *White* was decided in March 2012, while the petitioner's state post-conviction proceedings were still pending, and therefore does not constitute an intervening change in the law. Nor, consequently, does it establish the petitioner's actual innocence.[5]

Moreover, as discussed above, before this court may grant habeas relief to a state prisoner, the prisoner must exhaust the remedies available in the state courts. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Exhaustion requires a petitioner to "fairly present" federal claims so that state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon a petitioner's constitutional claim. *See O'Sullivan*, 526 U.S. at 842; *Picard v. Connor*, 404 U.S. 270, 275–77 (1971), *cited in Duncan v. Henry*, 513 U.S. 364, 365 (1995). In the Sixth Circuit, the doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court. *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998); *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987). Grounds One, Three, Four, and Five were never "fully and fairly" presented to

---

[5] In *White*, the Tennessee Supreme Court held that "the legislature did not intend for the kidnapping statutes to apply to the removal or confinement of a victim that is essentially incidental to an accompanying felony, such as rape or robbery," and that this "is a question for the jury after appropriate instructions, which appellate courts review under the sufficiency of the evidence standard as the due process safeguard." *Id.* at 562. The petitioner in this case pleaded guilty and thus waived his right to have a jury consider this question. As a result, *White* is of no help to him. Moreover, although *White* changed *who* decides the "essentially incidental" factor, it did not substantially alter the law regarding *how* it is established. That is, *White* did not change the elements necessary to prove especially aggravated kidnapping. *See State v. Dixon*, 957 S.W.2d 532, 533 ("This court has recognized that separate kidnapping convictions may violate due process when kidnapping is essentially incidental to other offenses for which a defendant has been convicted." (citing *State v. Anthony*, 817 S.W.2d 299 (Tenn. 1991))).

the state courts.

At this point, however, the petitioner is barred from presenting these claims in the state courts by Tennessee's one-petition rule governing the filing of post-conviction petitions. Tenn. Code Ann. § 40-30-102(c). He does not argue that any of the circumstances enumerated in Tenn. Code Ann. § 40-30-117(a)[6] permits him to re-open his post-conviction petition in the Tennessee courts. The ineffective-assistance, Brady-violation, coerced-confession, and due-process claims are therefore considered to be exhausted (because no further state review is available) but procedurally defaulted (because no state-court review was ever conducted). The petitioner has not demonstrated cause for the procedural default or actual prejudice resulting from the alleged constitutional errors.

He does appear to be trying to assert that he is actually innocent of the kidnapping charges such that failure to consider his claims, and particularly the new due-process claim, would result in a "fundamental miscarriage of justice." *Wogenstahl v. Mitchell*, 668 F.3d 307, 321 (6th Cir. 2012) (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). He does not, however, make a "truly persuasive demonstration of 'actual innocence.'" *Cf. Schlup v. Delo*, 513 U.S. 298, 316 n.32 (quoting *Herrera v. Collins*, 505 U.S. 390, 417 (1993)). Moreover, to make a claim of procedural innocence sufficient to overcome the procedural default of his due-process claim, such a claim must be supported by "new reliable evidence." *Schlup*, 513 U.S. at 324. The petitioner here has not presented new evidence of his innocence or shown an intervening change in the law; as stated above, *White* was decided while his state

---

[6] This provision permits a petitioner to file a motion in the state trial court to reopen his first post-conviction petition, but only if:

(1) The claim in the motion is based upon a final ruling of an appellate court establishing a constitutional right that was not recognized as existing at the time of trial, if retrospective application of that right is required. The motion must be filed within one (1) year of the ruling of the highest state appellate court or the United States supreme court establishing a constitutional right that was not recognized as existing at the time of trial; or

(2) The claim in the motion is based upon new scientific evidence establishing that the petitioner is actually innocent of the offense or offenses for which the petitioner was convicted; or

(3) The claim asserted in the motion seeks relief from a sentence that was enhanced because of a previous conviction and the conviction in the case in which the claim is asserted was not a guilty plea with an agreed sentence, and the previous conviction has subsequently been held to be invalid, in which case the motion must be filed within one (1) year of the finality of the ruling holding the previous conviction to be invalid; and

(4) It appears that the facts underlying the claim, if true, would establish by clear and convincing evidence that the petitioner is entitled to have the conviction set aside or the sentence reduced.

Tenn. Code Ann. § 40-30-117(a).

post-conviction proceedings were still pending, and it only confirmed that a properly instructed jury must decide whether a kidnapping is "essentially incidental" to the other charges of which the defendant is accused. *White*, 362 S.W.2d at 562. The petitioner cannot overcome the procedural default of this claim.

Because the claims are procedurally defaulted, the court does not reach their substantive merits. The petitioner is not entitled to relief on the basis of these claims (Grounds One, Three, Four, and Five).

**B.      Ground Two: That the Guilty Plea Was Not Knowing and Voluntary**

The petitioner contends that if he had understood that he "would not have been charged with both robbery and kidnapping" at a trial, he would have chosen to go to trial instead of pleading guilty. (ECF No. 1, at 4.) The respondent concedes that this claim was fully exhausted in the state-court proceedings and is properly before the court for habeas review. The respondent contends, however, that the Tennessee Court of Criminal Appeals' resolution of this issue did not constitute an unreasonable application of clearly established federal law.

As set forth above, at the post-conviction hearing, the petitioner testified, essentially, that he believed his counsel was not ready to go to trial, which prompted him to plead guilty. He claimed that his counsel never adequately explained the especially aggravated kidnapping charge and simply kept telling him that he would get a life sentence if he went to trial. He claimed to have learned later that, if he had proceeded to trial, he might have been convicted only of kidnapping or robbery, but not both.[7] The trial court rejected his claim, and the appellate court affirmed, reasoning as follows:

> To be valid, a plea must be entered knowingly, voluntarily, and intelligently. *See Boykin v. Alabama*, 395 U.S. 238, 242–44 (1969). A plea meets constitutional muster when the defendant understands both what the plea connotes and its consequences, *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993) (citing *Boykin*, 395 U.S. at 244), and makes a voluntary and intelligent choice from the alternative courses of action available to plead guilty, *Jaco v. State*, 120 S.W.3d 828, 831 (Tenn. 2003) (citing *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)). In *Mackey*, 553 S.W.2d at 341, our supreme court set forth the procedure that a trial court should follow when accepting a plea in

---

[7] The court takes judicial notice that the petitioner's co-defendant, Jerome Teats, chose to go to trial, was found guilty on one count of aggravated robbery and four counts of especially aggravated kidnapping, and received an effective 50-year sentence (17 years for aggravated robbery and 33 years for each of the kidnapping convictions, with the kidnapping sentences to be served concurrently with each other but consecutively to the robbery conviction), from the same trial judge who sentenced the petitioner. *State v. Jerome Teats*, M2012-01232-CCA-R3-CD, 2014 WL 98650, at *29 (Tenn. Ct. Crim. App. Jan. 10, 2014). Teats' conviction and sentence were recently upheld on appeal. *Id.* Under Tennessee law, sentences for especially aggravated kidnapping must be served at 100%, Tenn. Code Ann. § 40-35-501(i)(1), (i)(2)(C), so Teats will serve substantially more time than the 15 years the petitioner received as part of his plea agreement.

order to ensure that a defendant's plea is knowing, voluntary, and intelligent. A trial court must "substantially" comply with this procedure.

We have reviewed the transcript of the guilty plea hearing and conclude that the Petitioner's plea was constitutionally sound. At the guilty plea hearing, the Petitioner acknowledged that he understood: the nature of the charges for which he was pleading guilty and the potential sentencing ranges; his right to representation by counsel at trial; his right to a jury trial, wherein he could cross-examine the State's witnesses and he could but would not be forced to testify; his right to an appeal; and that these felony convictions could be used against the Petitioner in future proceedings to enhance his sentence in a future felony case. The Petitioner also denied that anyone was forcing him to enter into this guilty plea or that anyone was promising him anything other than what was included in the plea agreement. The Petitioner has failed to establish that he did not knowingly, intelligently, and voluntarily enter into his plea agreement. Accordingly, the Petitioner is not entitled to post-conviction relief on this basis.

*Simpkins*, 2013 WL 775957, at *10 (some internal citations omitted).

This court finds that the Tennessee Court of Criminal Appeals reasonably applied clearly held federal law to deny the petitioner relief. The court accurately cited and applied *Boykin*,[8] which contains the applicable standard, and the court reasonably found that the record supported the trial court's conclusion that the plea was knowing and voluntary. The petitioner also signed the plea petition, which stated, "I believe my lawyer has done everything any lawyer could have done to represent me and I am satisfied with my legal representation and assistance in this case. I have no problem communicating with my attorney." (Plea Petition, ECF No 6-1, at 11.) The petitioner is not entitled to relief on the basis of this claim.

**VII.  CONCLUSION**

For the reasons set forth herein, Tironne Simpkins' petition under § 2254 will be denied and this matter dismissed with prejudice. An appropriate order is filed herewith.

_____
Aleta A. Trauger
United States District Judge

---

[8] The state court also referred to *Alford*, and the petitioner's statements that he intended to enter a "best interest" plea suggest that *Alford* might have some application. An *Alford* plea is "a guilty plea entered by a defendant who either: 1) maintains that he is innocent; or 2) without maintaining his innocence, 'is unwilling or unable to admit' that he committed 'acts constituting the crime.'" *United States v. Tunning*, 69 F.3d 107, 110 (6th Cir. 1995) (quoting *Alford*, 400 U.S. at 37). The distinction between a regular plea and an *Alford* plea makes no difference in this case, but even if it did, the petitioner here effectively admitted at the post-conviction hearing that he was not innocent of either the robbery or of the acts that constituted the kidnapping offense. (*See* Post-Conviction Tr. 6:8–7:11, 20:3–22:16, ECF No. 6-2, at 7–8, 21–23.)